UNITED STATES BANKRUPTCY COURT
DISTRICT OF MAINE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | \* |
| | \* |
| **Corrina LOOK,** | \*   Chapter 13 |
| and Justin LOOK, | \*   Case No.  07-20355 |
| | \* |
| **Debtors** | \* |
| | \* |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## MEMORANDUM OF DECISION

This confirmation contest, submitted for decision on a stipulated record, calls for construction of the so-called "hanging paragraph," added to Bankruptcy Code § 1325(a)(9) by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 (BAPCPA).[1] The critical issue is whether a creditor holding a security interest in a motor vehicle, who otherwise comes within the "anti-birfurcation" protection of the hanging paragraph, is entitled to that protection if its lien secures a debt consisting not only of the sale price of the vehicle, but of the amount required to pay off a lien encumbering a trade-in, as well.

---

[1]     BAPCPA is Pub.L. 109-8, 119 Stat. 23 (April 20, 2005).

The section in question, set forth infra at p.5, has been called the "hanging paragraph" because, although set forth as a subparagraph following § 1325(a)(9), it is not separately designated by letter or number. Some courts treat it as part of § 1325(a)(9), while others have denominated it § 1325(a)(*). See In re Pajot, 371 B.R. 139, 143 n.2 (Bankr. E.D. Va. 2007).

Unless otherwise indicated, all citations to statutory sections are to the Bankruptcy Code of 1978, as amended, 11 U.S.C. § 101 et seq.

This memorandum sets forth my findings of fact and conclusions of law in accordance with FED. R. CIV. P. 52 and FED. R. BANKR. P. 7052, 9014(c).

1

On this point (and others), the hanging paragraph's meaning is not crystalline. As explained below, I conclude that because the secured claim at issue is comprised of both purchase-money and nonpurchase-money components, it is subject to modification in the debtors' Chapter 13 plan.[2]

## The Statutory Context

Before we turn to this case's simple facts, a preliminary precis of statutory context is useful. With it in hand, the essence of the dispute will quickly become clear.

Commonly, bankruptcy rehabilitation includes adjustment of obligations owed to creditors holding liens on a debtor's property. Principally, lien creditors are deemed to hold a secured claim only to the extent of the value of the property their lien encumbers. Beyond that amount, the balance the debtor owes is treated as a separate, unsecured claim. See § 506(a). The concept is commonly dubbed claim "bifurcation." See generally, 4 COLLIER ON BANKRUPTCY ¶ 506.03 (Alan N. Resnick & Henry J. Sommer, eds., 15th ed. rev. 2007).[3] The debtor's plan will be

---

[2] I say the explanation will be lengthy. Although it will be long enough to test many readers' patience, I do not intend to recite the rationale's recipe from scratch. Many courts have explained the issues and options comprehensively. This opinion will reference their work and refer the reader to it, rather than repeat it here.

[3] Section 506 provides, in relevant part:

> (a)(1) An allowed claim of a creditor secured by a lien on property in which the estate has an interest, or that is subject to setoff under section 553 of this title, is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property, or to the extent of the amount subject to setoff, as the case may be, and is an unsecured claim to the extent that the value of such creditor's interest or the amount so subject to setoff is less than the amount of such allowed claim. Such value shall be determined in light of the purpose of the valuation and of the proposed disposition or use of such property, and in conjunction with any hearing on such disposition or use or on a plan affecting such creditor's interest.

2

confirmed if it provides that the secured claim will receive payments with a present value equal to the value of the collateral. See §§ 1325(a)(5)(B)(ii); 1129(b)(2)(A)(i)(II). To that extent, the lien continues to secure the claim. See §§ 1325(a)(5)(B)(i)(I); 1129(b)(2)(A)(i)(I); see also Brooks v. General Motors Acceptance Corp. (In re Brooks), 340 B.R. 648, 652 n.5 (Bankr. D. Me. 2006)(citing § 1325(a)(5)(B)(i) as an illustration of how, in BAPCPA, "Congress sided with those courts that have found it impermissible for debtors to require secured creditors to release their liens prior to plan completion and discharge."); In re Hopkins, 371 B.R. 324, 326 (Bankr. N.D. Ill. 2007)(identifying lien retention requirements found in § 1325(a)(5)(B)(i)(I)(aa)); In re Hill, No. 06-80502, 2007 WL 499622, slip op. at *3 (Bankr. M.D.N.C. Feb. 12, 2007)("[A] Chapter 13 plan must provide that a secured creditor retain its lien until the payment of the entire underlying debt or the entry of the discharge, not simply until the secured portion of the debt is paid."); In re Northwest Timberline Enterprises, Inc., 348 B.R. 412, 435 (Bankr. N.D. Tex. 2006)("Section 1129(b)(2)(A)(i)(I) requires that holders of secured claims 'retain the liens securing such claims . . . to the extent of the allowed amount of such claims.'"). This bifurcation power, coupled with the power to cure prepetition arrearages, see §§ 1322(b)(3); 1123(a)(5)(G), provides reorganizing debtors with leverage to negotiate with secured claimants, the ability to confirm a plan paying these creditors less than the total obligation, and, often, to retain encumbered assets.

    The bifurcation power is not without exceptions. Although Chapter 13 debtors are generally able to "modify" (read bifurcate) the claims of secured creditors, § 1322(b)(2) precludes modification of the rights of creditors whose claims are secured "only by a security interest in real property that is the debtor's principal residence . . . ." 11 U.S.C. § 1322(b)(2); see, e.g., Lomas

---

    11 U.S.C. § 506(a)(1).

Mortgage, Inc., v. Louis, 82 F.3d 1 (1st Cir. 1996)(discussing bifurcation and residence).

For consumer debtors, bifurcation has historically enabled them to modify the claims of creditors who financed car purchases and who held liens on the vehicles to secure their claims. As Judge Clark recently explained:

> Outside of bankruptcy, of course, a car creditor's being underwater only matters if the creditor actually has to repossess and sell the car to satisfy its claim. So long as the debtor wants to keep the car, however, the only way for the debtor to get a release of the security interest on the car is to pay off the car debt in full. Inside bankruptcy, however, the debtor is permitted to "mimic" what would happen in the event the lender sold the vehicle to satisfy the debt, but without the consequences of actually losing the car. A court rules what that value would be, without actually exposing the vehicle to sale, and the resulting number becomes the number that ends up being "financed" by way of section 1325(a)(5)(B)(ii). The balance of any debt owed the creditor is then separately treated as unsecured debt, paid pro rata along with other unsecured creditors.

In re Sanders, 377 B.R. 836, 844 (Bankr. W.D. Tex. 2007). That ability to bifurcate secured car loans, which was unqualified until BAPCPA's enactment, is now limited by the terms of the hanging paragraph. Although § 1322(b) still empowers a debtor to modify generally secured claims and cure defaults, § 1325(a) now provides:

(a) Except as provided in subsection (b), the court shall confirm a plan if --

\* \* \*

(5) with respect to each allowed secured claim provided for by the plan --

(A) the holder of such claim has accepted the plan;

(B)(i) the plan provides that --
(I) the holder of such claim retain the lien securing such claim until the earlier of --
(aa) the payment of the underlying debt determined under nonbankruptcy law; or

(bb) discharge under section 1328; and

4

>> (II) if the case under this chapter is dismissed or converted without completion of the plan, such lien shall also be retained by such holder to the extent recognized by applicable nonbankruptcy law;  and

> (ii) the value, as of the effective date of the plan, of property to be distributed under the plan on account of such claim is not less than the allowed amount of such claim; and

> (iii) if --

>> (I) property to be distributed pursuant to this subsection is in the form of periodic payments, such payments shall be in equal monthly amounts; and

>> (II) the holder of the claim is secured by personal property, the amount of such payments shall not be less than an amount sufficient to provide to the holder of such claim adequate protection during the period of the plan; or

> (C) the debtor surrenders the property securing such claim to such holder;

>             *             *             *

> (9) the debtor has filed all applicable Federal, State, and local tax returns as required by section 1308.

> *For purposes of paragraph (5), section 506 shall not apply to a claim described in that paragraph if the creditor has a purchase money security interest securing the debt that is the subject of the claim, the debt was incurred within the 910-day [sic] preceding the date of the filing of the petition, and the collateral for that debt consists of a motor vehicle (as defined in section 30102 of title 49) acquired for the personal use of the debtor, or if collateral for that debt consists of any other thing of value, if the debt was incurred during the 1-year period preceding that filing.*

11 U.S.C. § 1325(a)(emphasis supplied).

Simply stated (for our purposes)[4] the hanging paragraph's provisions apply to prevent

---

[4] For today, we needn't concern ourselves with the hanging paragraph's application to claims secured by "anything of value" if the "debt was incurred" within a year of bankruptcy.

bifurcation of claims (a) secured by a "purchase money security interest," (2) in a "motor vehicle," (3) "acquired for the personal use of the debtor," (4) within the "910-day [sic] preceding the date of the filing of the petition."

But stating the statute's terms is easier than applying them. The hanging paragraph's provisions have spawned multiple issues, including the meaning and proper application of "personal use of the debtor,"[5] the contours of "purchase money security interest,"[6] what constitutes a "motor vehicle,"[7] and what it means to say "section 506 shall not apply."[8]

---

[5] See, e.g., In re Hickey, 370 B.R. 219, 221 (Bankr. D. Neb. 2007)(finding that the language 'acquired for the personal use of the debtor' applies only to motor vehicles); In re Fletcher, No. 07-10597-BKC-RBR, 2007 WL 1804931, slip op. at *4 (Bankr. S.D. Fla. June 19, 2007)(analyzing the meaning of "acquired for personal use" and finding the "significant and material" test superior to the "totality of the circumstances" test); In re Garrison, No. A06-00396-DMD, 2007 WL 1589554, slip op. at *2 (Bankr. D. Alaska June 1, 2007)(concluding that the hanging paragraph did not apply to bar claim bifurcation where there was "substantial business use for the vehicle"); In re Solis, 356 B.R. 398, 408-11 (Bankr. S.D. Tex. 2006)(dividing and analyzing each part of the phrase "acquired for the personal use of the debtor"); In re Hill, 352 B.R. 69, 72 (Bankr. W.D. La. 2006)(concluding that the issue of "personal use" is best determined by considering the "totality of circumstances" surrounding the acquisition of the vehicle.)

[6] See discussion infra.

[7] The law on this point is, in a word, undeveloped. The hanging paragraph references 49 U.S.C. § 30102(a)(6) which provides that a motor vehicle "means a vehicle driven or drawn by mechanical power and manufactured primarily for use on public streets, roads, and highways, but does not include a vehicle operated only on a rail line." See 49 U.S.C. § 30102(a)(6); see also, In re Green, 360 B.R. 34, 40 (Bankr. N.D.N.Y. 2007)("There is a lack of bankruptcy court cases interpreting the 49 U.S.C. § 30102(a)(6) definition of a motor vehicle. This may be attributable to the fact that the Code § 1325(a) hanging paragraph containing the reference to 49 U.S.C. § 30102(a)(6) was added to the Code with the BAPCPA revisions which have been effective only since October 17, 2005. The pre-BAPCPA Code did not define the term 'motor vehicle', or reference another federal statute for its definition."); Illinois Marine Towing, Inc. v. Barnick (In re Barnick), 353 B.R. 233, 240-41 (Bankr. C.D. Ill. 2006) (examining the term in the context of pre-BAPCPA § 523(a)(9) and noting "the need perceived by Congress to define the term *motor vehicle* in Section § 1325(a) at least reflects an awareness of the term's ambiguity.").

[8] See, e.g., In re Wright, 492 F.3d 829, 832-33 (7th Cir. 2007) ("[B]y knocking out § 506, the hanging paragraph leaves the parties to their contractual entitlements. . . . Creditors don't

**Facts**

Corrina Look purchased a 2005 Subaru Impreza on credit from Patriot Subaru on December 30, 2004. The retail installment contract she signed granted Patriot a first priority security interest in the Subaru, securing all Corrina's payment obligations. Bank of America took assignment of the contract and its accompanying lien. Including a service contract and sales tax, the contract shows the Subaru's "cash price" as $21,796.26.

As part of the deal, Corrina traded in her older car, receiving an allowance of $13,900.00. At the time, however, the loan balance secured by a lien on the trade-in was $21,222.26, resulting in a "negative net trade-in" of $7,322.26. After applying a $1,500.00 manufacturer's rebate, the "negative net trade-in" was reduced to $5,822.26. Corrina was also charged for gap insurance ($495.00) and documentation ($245.00). Taking all charges and the trade-in into account, the total amount financed in the transaction was $28,358.52.[9] Bank of America retained a lien on the Subaru to secure payment of that sum.

The parties agree that the Subaru is a "motor vehicle," that the car was purchased for Corrina's "personal use," that Bank of America's lien is perfected, and that Corrina incurred the

---

need § 506 to create, allow, or recognize security interests, which rest on contracts (and the UCC) rather than federal law."); In re Particka, 355 B.R. 616, 625 (Bankr. E.D. Mich. 2006)("[T]he effect of the hanging paragraph's statement that § 506 no longer applies to § 1325(a)(5) creates the same result. The result is that a debtor cannot retain a 910 vehicle under § 1325(a)(5)(B) by paying a cram down value determined by the bifurcation process of § 506."); Dupaco Cmty. Credit Union v. Zehrung (In re Zehrung), 351 B.R. 675, 678 (W.D. Wis. 2006)("The creditor's rights being unmodified by § 506, it is entitled to its state law right to liquidate the collateral and retain an unsecured claim for the balance due.")(citation omitted).

[9]  The parties' stipulation pegs the total amount financed at $28,383.01, $24.49 more than my computation. For today, the difference is noted but immaterial. It can be dealt with when Bank of America's secured and unsecured claims are liquidated.

debt secured by the Subaru within 910 days of her chapter 13 filing.

As of Corrina's bankruptcy filing, Corrina owed Bank of America $20,599.13 on the car loan. Her plan proposes to satisfy the bank's secured claim with payment of $12,416.00, at 8.0% interest.[10]

## Discussion

Bank of America insists that Corrina's plan pay the entire contract balance as a secured claim because it holds a "purchase money security interest," thus entitling it to the hanging paragraph's anti-bifurcation protections. Corrina asserts that, since the bank's lien secures obligations other than the price of her car (viz., the value extended to pay off the loan on the trade-in), those protections do not apply and the bank's secured claim can be reduced to the value of its collateral via § 506(a).

**1. What constitutes a "purchase money security interest" for purposes of the hanging paragraph?**

The Code itself provides no definition of "purchase money security interest." In re Sanders, 377 B.R. at 861 n.21; In re Westfall, 365 B.R. 755, 759 (Bankr. N.D. Ohio 2007). Neither does it declaim that the term is to be defined by state law or "applicable nonbankruptcy law."[11]

---

[10] The plan originally proposed a rate of 6.75%, but the parties have now agreed, pending resolution of the instant controversy, that the secured claim will be paid at 8.0%. The balance of the bank's contract claim will be treated as unsecured.

[11] The hanging paragraph presents unique interpretive challenges. To begin, it "hangs" without ordered designation and without immediately surrounding context. The legislative history is unilluminating. See In re Quick, 371 B.R. 459, 463 (B.A.P. 10th Cir. 2007). The paragraph neither provides nor refers to a definition of its pivotal term: "purchase money security interest." One might invoke many a broad rule, or any of statutory construction's myriad canons, to no effect. One is left to assay the term's content by ascertaining the meaning by which it is "commonly

Most courts acknowledge that, notwithstanding the Code's lack of direction on the point, the term "purchase money security interest" (or "pmsi") carries with it a generally understood content, rooted in the Uniform Commercial Code ("U.C.C."). See 11 M.R.S.A. § 9-1103 (Supp. 2007) (Maine's U.C.C.) see, e.g., In re Vega, 344 B.R. 616, 622 (Bankr. D. Kan. 2006). Most decisions determining the term's meaning have looked to state law for guidance. See, e.g., In re Johnson, 380 B.R. 236, 240 (Bankr. D. Or. 2007); In re Hayes, 376 B.R. 655, 667-68 (Bankr. M.D. Tenn. 2007)(citing Butner v. United States, 440 U.S. 48, 55 (1979)); In re Pajot, 371 B.R. at 147 (citing In re Vega, 344 B.R. at 622). At the same time, courts acknowledge that comments to the U.C.C. caution that its definition was fashioned for limited purposes (namely, perfection and priority), and that it was not intended for wholesale importation into other statutory contexts, including the Bankruptcy Code. Official Comment 8 to § 9-103 of the U.C.C. provides: "The Bankruptcy Code does not expressly adopt the state law definition of 'purchase money security interest.' Where federal law does not defer to this Article, this Article does not, and could not, determine a question of federal law." Official cmt. 8; see also In re Johnson, 380 B.R. at 240 ("Official Comment 8 . . . indicates that usage of the term 'purchase money security interest' under Article 9 of the UCC is not meant to preempt the definition or characterization of the term under other statutes, including the Bankruptcy Code."); In re Westfall, 376 B.R. 210, 216-217 (Bankr. N.D. Ohio 2007)("The intent of the framers of the Uniform Commercial Code is quite clear: the

---

 understood."

> "But though I shout the wisdom of the maps,
> I am a salmon in the ring shape river."

TIM BUCKLEY, *Starsailor, on* STARSAILOR (Rhino Records 1991)(1970).

9

state law definition of purchase money security interest was not meant to apply to bankruptcy law. . . . [T]he state statute . . . was intended to be used only for matters involving perfection and priority.")

At least one court, paying heed to the U.C.C.'s caveat, and considering that some differences do exist in the way state courts interpret and apply the term, has concluded that a uniform, federal definition of "purchase money security interest" should be employed so that the hanging paragraph is applied uniformly, in a fashion consistent with federal bankruptcy objectives.  See In re Westfall, 376 B.R. at 213 (noting "[t]he maddeningly inconsistent body of decisions" stemming from the lack of a clear definition of "purchase money security interest"). The Westfall court considered "the need for uniformity, whether application of state law frustrates important federal policies, and the impact of federal common law on preexisting commercial relationships premised on state law," id. at 215 (citations omitted), and determined that it was necessary to apply a uniform federal definition of the term for purposes of the hanging paragraph.

Other courts, aware of the divergence in rulings on this issue, have looked to state law to garner a "general understanding" of the undefined term.  "While there is temptation to look for a federal definition of 'purchase money security interest,' prominent use of a term of art so closely identified with the Uniform Commercial Code and established state law counsels reference to state law." In re Hayes, 376 B.R. at 667-68.  Courts that have looked to state law to construe the definition of "pmsi" have reasoned that, in its decision to leave undefined a key element of this provision, and signaling no intent to the contrary, Congress presumably intended that the term take on the same meaning for hanging paragraph purposes as it has acquired outside the bankruptcy context.  See, e.g., In re Sanders, 377 B.R. at 846 ("Congress is deemed to

understand the context in which terms of art are used. . . . [W]hen a statutory term is undefined within a given piece of legislation, that term is normally expected to be given its ordinary and generally understood meaning within the statutory context. . . . This is especially so when Congress employs a term of art that has acquired meaning in the non-bankruptcy context.")(citations omitted); see also Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 388 (1993)("Courts properly assume, absent sufficient indication to the contrary, that Congress intends the words in its enactments to carry 'their ordinary, contemporary, common meaning.'")(quoting Perrin v. United States, 444 U.S. 37, 42 (1979)). Where an undefined term is one of art, Congress is presumed to be aware of both the legal meaning of that term of art and the common usage upon which such meaning is based. Heckathorn v. United States Dept. of Educ. (In re Heckathorn), 199 B.R. 188, 194-95 (Bankr. N.D. Okla. 1996)("Although the words 'undue' and 'hardship' are common English words, their combination in this statute obviously constitutes a term of art, i.e., a phrase with a particular legal meaning and function, which is based on but may be more specialized than common usage."). While the Code offers no clear guidance to aid in interpretation, the U.C.C. sets out a general definition of "purchase money security interest." As posited by the court in Sanders, Congress presumably was aware that "purchase money security interest" is a term of art used in the U.C.C.; thus, an examination of the term in that context is an appropriate guide for the present inquiry. Sanders, 377 B.R. at 846; accord In re Mitchell, 379 B.R. 131,136 (Bankr. M.D. Tenn. 2007); In re Vega, 344 B.R. at 622.

  Sanders' reasoning is convincing. "The Supreme Court held in Butner v. United States . . . that state law determines rights and obligations when the Code does not supply a federal rule." In re Wright, 492 F.3d at 832 (citations omitted); see also In re Leicht, 222 B.R. 670, 681 n.14

11

(B.A.P. 1st Cir. 1998)("The substantive law of bankruptcy is federal law of course, but bankruptcy practice has always involved a complex interplay of state as well as federal law. Ranging from the validity and priority of liens, to the strong-arm powers of the trustee under Bankruptcy Code § 544, to the determination of the property comprising the assets of the estate, application of many bankruptcy rules depends on state law characterization.")(quoting Lawrence Ponoroff, Exemption Limitations: A Tale of Two Solutions, 71 Am. Bankr. L.J. 221-22 (1997))(footnotes omitted).

The Code often incorporates, or defers to, state law, leading to "inconsistent" results, but without doing violence to the overall objectives of bankruptcy. See, e.g., § 522(b)(permitting the debtor's use of state law exemptions); § 546(b)(subjecting certain rights and powers of a trustee to "any generally applicable law" that meets certain criteria); § 723(a)(granting the trustee a claim against a general partner "to the extent that under applicable nonbankruptcy law such general partner is personally liable for such deficiency"). In particular, when no federal objective requires another result, the defining content of property interests has long been understood to be the province of state law. "Though federal law determines what property constitutes property of the bankruptcy estate, '[p]roperty interests are created and defined by state law.'" In re Tuck, No. 06-10886-DHW, 2007 WL 4365456, slip op. at *2 (Bankr. M.D.Ala. Dec.10, 2007)(citing Butner v. United States, 440 U.S. at 55); see also In re Beeman, 235 B.R. 519, 525 (Bankr. D.N.H. 1999) ("[W]hen a foreclosure sale is complete turns on state law. This conclusion follows from the fact that § 1322(c)(1) modifies 'sold at a foreclosure sale' with 'that is conducted in accordance with applicable nonbankruptcy law')(citing M.C. Schnick v. Stephens (In re Stephens), 221 B.R. 290, 294 (Bankr. D. Me. 1998).

Thus, I reject the premise that federal bankruptcy objectives necessitate adoption of a federal definition of the term "purchase money security interest," and turn to state law to inform our inquiry.

The U.C.C. entwines the definition of "purchase money security interest" with those of other, related terms. The statute defines "purchase-money collateral" as "goods or software that secures a purchase-money obligation incurred with respect to that collateral." 11 M.R.S.A. § 9-1103(1)(a)(Supp. 2007). A "purchase-money obligation" is "an obligation of an obligor incurred as all or part of the price of the collateral or for value given to enable the debtor to acquire rights in or the use of the collateral if the value is in fact so used." 11 M.R.S.A. § 9-1103(1)(b)(Supp. 2007). Finally, "[a] security interest in goods is a purchase-money security interest . . . [t]o the extent that the goods are purchase-money collateral with respect to that security interest." 11 M.R.S.A. § 9-1103(2)(a)(Supp. 2007).

Bank of America maintains that, under the U.C.C. definition of "purchase money security interest," it holds a secured claim on the entire balance owed under the contract because the negative equity resulting from the trade-in of Corrina's former vehicle is part of the price of the collateral. Whether such negative equity is included in the "price of the collateral" has been addressed by other courts, with inconsistent results. See In re Tuck, 2007 WL 4365456, slip op. at *2 (collecting cases on both sides of the issue). One line of cases holds that negative equity is not part of the price of the collateral and thus not a purchase money obligation. In re Westfall, 376 B.R. 210 (Bankr.N.D.Ohio 2007); In re Bray, 365 B.R. 850 (Bankr. W.D. Tenn. 2007); In re Acaya, 369 B.R. 564 (Bankr. N.D. Cal. 2007); In re Blakeslee, 377 B.R. 724 (Bankr. M.D. Fla. 2007); In re Pajot, 371 B.R. 139 (Bankr. E.D. Va. 2007). Other courts have held just the

13

opposite. Graupner v. Nuvell Credit Corp. (In re Graupner), Case No. 4:07-CV-37CDL, 2007 WL 1858291, slip op. at *2 (M.D. Ga. 2007), *aff'g* 356 B.R. 907 (Bankr. M.D. Ga. 2006); In re Schwalm, 380 B.R. 630 (Bankr. M.D. Fla. 2008); In re Cohrs, 373 B.R. 107 (Bankr. E.D. Cal. 2007); In re Petrocci, 370 B.R. 489 (Bankr. N.D.N.Y. 2007).

Guidance from the drafters of the U.C.C. appears in the form of Official Comment 3, which reads in part:

> [T]he definition of "purchase-money obligation," the "price" of collateral or the "value given to enable" includes obligations for expenses incurred in connection with acquiring rights in the collateral, sales taxes, duties, finance charges, interest, freight charges, costs of storage in transit, demurrage, administrative charges, expenses of collection and enforcement, attorney's fees, and other similar obligations.
>
> The concept of "purchase-money security interest" requires a close nexus between the acquisition of collateral and the secured obligation. Thus, a security interest does not qualify as a purchase-money security interest if a debtor acquires property on unsecured credit and subsequently creates the security interest to secure the purchase price.

A careful reading of the Comment does not support counting negative equity as part of a 910-day car lender's purchase-money obligation. The listed examples do not include value given to pay off an existing debt. Admittedly, the list itself is not exhaustive. In re Cohrs, 373 B.R. at 109. But while the definition of "purchase-money obligation" extends beyond those expenses enumerated to "other *similar* obligations," I am unconvinced that negative equity arising out of the trade-in of a debtor's former vehicle qualifies as such. The Comment demands a "close nexus between the acquisition of collateral and the secured obligation." In re Sanders 377 B.R. at 857. There is no such nexus here. Id.; see also In re Tuck, 2007 WL 4365456, slip op. at *3 ("Negative equity from a trade-in is not an expense directly related to the purchase of the second

14

vehicle nor incidental to that purchase. It is not an obligation 'similar' to those on the list."); In re Johnson, 380 B.R. at 243 ("[T]he liability for negative equity is not an expense 'incurred in connection with acquiring' the Vehicle; it is an antecedent debt."); but see In re Graupner, 2007 WL 1858291, slip op. at *2 (finding a close nexus between negative equity and the "package transaction" of which the trade-in was "an integral part," and concluding that negative equity is part of the price of the collateral). The value advanced by Patriot Subaru enabled Corrina Look to refinance the obligation secured by her trade-in. And, as a consequence, Patriot Subaru obtained clear rights to the trade-in. It did not "enable" Corrina to purchase her new car.

**2. Consequences of the non-PMSI nature of Bank of America's Lien**

Given my conclusion that the loan secured by Bank of America's lien on Corrina's car is not a purchase money security interest, the question becomes: What are the consequences of that determination.

Again, this situation has not lain unexamined by the courts. Most, having mined state law in determining the content of "purchase money security interest," apply state law concepts in determining the consequences of an "unpure PMSI." See, e.g., In re Pajot, 371 B.R. at 157-158. Some apply the "transformation" rule, which dictates that a lien securing purchase money advances mixed with other indebtedness is transmogrified to a totally non-purchase money lien. See, e.g., In re Peaslee, 358 B.R. 559-60, *rev'd*, General Motors Acceptance Corp. v. Peaslee, 373 B.R. 252 (W.D.N.Y. 2007)); In re Price, 363 B.R. 734, 745-46 (Bankr. E.D.N.C. 2007); In re Blakeslee, 377 B.R. at 730. Others follow the "dual status" doctrine and, after allocating the lien between purchase money and other obligations, provide pmsi protection to the extent of purchase money actually secured by the lien. See, e.g., In re Pajot, 371 B.R. at 157-58; In re Acaya, 369

15

B.R. at 570-71.[12]

I agree with the Sanders court that, although we must look to state law to determine the *content* of the term that triggers the hanging paragraph's application, it is unnecessary, indeed inappropriate to look to state law to determine the *consequences* of a determination that a lien is not a purchase money security interest. As discussed in Sanders:

> The application of the dual status and transformation rules are appropriate in the non-bankruptcy context when deciding (under state law) whether and to what extent a creditor retains a purchase money security interest when part of the consumer debt is a non-purchase money obligation.
>
> Our task is different. Our task is to determine whether [the secured creditor] qualifies for the special protection afforded certain creditors under the 910-day provision of the Bankruptcy Code, a question of federal law. For that task, state law rules regarding the application of either the transformation rule or dual status rule are simply irrelevant. . . . We looked to state law to understand the common meaning of a particular term which was otherwise undefined by the Bankruptcy Code. We did so because accepted rules of statutory construction employed by *federal* courts counsel us to do so. Once that task has been completed (as it has been here), we must then return to our original task, that of divining the correct interpretation of the statutory language enacted by Congress in the hanging paragraph appended to section 1325(a).

Sanders, 377 B.R. at 858. Thus, there is no need to consider the application of the dual status or transformation rules; the language of the Code, not state law, directs the treatment of Bank of

---

[12] Application of the dual status rule gives way to the possibility of variety in the treatment of payments between the sale and the filing. The Pajot court, for example, evaluated dual status payment allocation methods and chose to allocate payments under the dual status rule "proportionally, according to the ratio of the non-purchase money portion to the total amount financed." In re Pajot, 371 B.R. at 162. After concluding that the lien in question secured both purchase money and non-purchase money debt, the one court that constructed a federal law definition of "pmsi" applied an allocation rule, much like the dual status doctrine, to determine the extent to which the hanging paragraph protected the security interest from bifurcation. To determine the amount the secured and unsecured portions of a claim with a partial purchase money security interest, the Westfall court employed a simple percentage formula based on the original transaction, and found the results to be preferable to the "too severe" results engendered by application of the transformation rule. In re Westfall, 376 B.R. at 219.

America's lien.

The statute provides that § 506(a) bifurcation shall be excluded "*if the creditor has a purchase money security interest securing the debt that is the subject of the claim*." § 1325(a)(emphasis added). The decision to employ conditional "if" language rather than "to the extent" language bolsters the conclusion that Congress did not extend such protections in instances where creditors possess partial pmsi's. As noted recently by the Bankruptcy Appellate Panel for this Circuit, "[i]t is generally presumed that Congress acts intentionally and purposely when it includes particular language in one section of a statute but omits it in another." Kibbe v. Sumski (In re Kibbe), 361 B.R. 302, 313 (B.A.P. 1st Cir. 2007)(citations omitted); see also In re Sanders, 377 B.R. at 859. Congress knows how to employ "to the extent" language and has done so in other instances. See, e.g., §§ 303(f); 346(d); 541(a)(2)(B); 550(a); 723(a); 726(a)(4); 1106(a)(3); 1129(a)(9). The failure to do so here must be seen as purposeful. In re Sanders, 377 B.R. at 859, 860. Similarly, Congress included no language to signal its intent that the hanging paragraph encompass debt that is only partially secured by a pmsi.

Possession of a claim secured by a purchase money security interest qualifies a creditor for the exception to the general rule that claims may be bifurcated to the extent of the value underlying collateral securing the claim. Just as Corrina's car must have been purchased for her personal use within 910 days of the bankruptcy filing, so must this prerequisite must be met in order for Bank of America's claim to avoid the reach of § 506. "[T]he plain language of the hanging paragraph of section 1325(a) clearly and unambiguously calls for an all-or-nothing rule . . . ." In re Sanders, 377 B.R. at 864.

Because not all of the debt in question is secured by a pmsi, § 1325(a) does not apply and

17

Bank of America's lien is subject to modification.

## Conclusion

Bank of America's objection is overruled. A final hearing on confirmation of the Looks' Chapter 13 plan will be set forthwith.

| | |
|---|---|
| March 6, 2008 | /s/ James B. Haines, Jr. |
| Date | James B. Haines, Jr., Judge |
| | U.S. Bankruptcy Court |